UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANDREI PAGSISIHAN,

     Petitioner,

     v.

BRIAN ENGLISH, KRISTI NOEM, PAM
BONDI, TODD M. LYONS, and SAMUEL
OLSON,

     Respondents.

CAUSE NO. 3:26cv40 DRL-SJF

OPINION AND ORDER

Immigration detainee Andrei Pagsisihan filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241, arguing that he is being unlawfully detained in the custody of United States Immigration and Customs Enforcement (ICE). The respondents answered the petition. Mr. Pagsisihan did not file a reply, but he filed a motion for immediate release, which the court will construe as a reply. The court now grants the petition.

Mr. Pagsisihan has a complicated immigration and criminal history, which the court takes from an Illinois appellate decision, *People v. Pagsisihan*, 170 N.E.3d 578 (Ill. App. Ct. 2020), which Mr. Pagsisihan provided to the court [6]. Mr. Pagsisihan came to the United States from the Philippines in 1974 with his mother at age seven and overstayed his visa. In 1985, he was convicted of vehicle theft and sentenced to two years of probation and 20 weekends of periodic imprisonment. In 1987, he was convicted of possessing a stolen motor vehicle and sentenced to three years in prison.

In 1989, Mr. Pagsisihan was ordered deported to the Philippines based on committing crimes of moral turpitude. He was never removed from the United States, however. He was later convicted and sentenced on another undisclosed crime. Upon his release from prison in 1995, he was held for several months in an immigration facility before being released on a supervision order. Mr. Pagsisihan committed another undisclosed crime; and, while he was incarcerated, ICE issued an immigration detainer on February 9, 2009, requiring the Illinois prison to detain him and notify ICE at least 30 days before he was released.

About a year later, Illinois charged Mr. Pagsisihan with first degree murder and attempted first degree murder for a shooting that took place in 1998.[1] Mr. Pagsisihan agreed to plead guilty to both offenses in exchange for a 38-year sentence for first degree murder to run concurrently with a 10-year sentence for attempted murder.

Mr. Pagsisihan filed a state post-conviction petition, seeking to overturn his conviction on the basis of ineffective assistance of counsel; he alleged his counsel was deficient because he was not informed of the immigration consequences of his guilty plea. Although Mr. Pagsisihan was already subject to a deportation order, he argues he was not informed that this conviction could make him a higher priority for removal and make him ineligible for any discretionary relief from removal. The appellate court remanded the case to the trial court for an evidentiary hearing. The ultimate outcome of the post-conviction petition is not in the record.

---

[1] It is unclear from the record whether Mr. Pagsisihan was released from prison before this new charge or whether he remained incarcerated during these criminal proceedings.

In his habeas petition, Mr. Pagsisihan alleges he was released from prison on September 11, 2025; he says his good behavior earned him good time credits that allowed him an early release. On September 29, 2025, ICE took him into custody, and he remains detained.

Mr. Pagsisihan argues his detention is unlawful because his removal is not reasonably foreseeable. ICE's precursor agency determined in 1995 that there was no reasonable likelihood of removal, and, he argues, nothing has changed over the next 31 years. Mr. Pagsisihan contends the Philippine government will not issue travel documents for him because he does not have a Philippine birth certificate or passport. The Philippine Consulate in Chicago informed him in 1995 that it did a thorough search in the Philippines and could not locate a birth certificate for him. Since his current detention began, Mr. Pagsisihan contacted the Philippine Consulate in Chicago, and the Consulate repeated that it could not find a birth certificate for him.

When answering the petition, the respondents (which the court has not winnowed because its show cause order omitted a show cause component) provided a declaration from a deportation officer, stating "ICE ERO has requested travel documents for [Mr. Pagsisihan] from the Philippines" [14-1]. The declaration does not state when the request was made; but as of February 11, 2026, when the declaration was signed, the request was still pending. Additional time has passed, and the government has not offered the court any update on its progress with deportation.

In reply, Mr. Pagsisihan argues that respondents have not rebutted his assertion that removal is not reasonably foreseeable. In particular, he points out that respondents have not

explained how they will obtain travel documents without his birth certificate or any other identifying documents to prove his citizenship in the Philippines. He attaches a letter from the Philippine Consulate General's Office in Chicago, dated January 5, 2026 [19-1], stating:

> As previously relayed, the Consulate General may only issue a travel document, in lieu of a passport, only to individuals who have not naturalized in another country (except dual citizens under RA 9225) and who can present proof of Philippine citizenship, namely a birth certificate (if born in the Philippines) or a report of birth (if born abroad) indicating Filipino parentage.
>
> In your case, a certification from the National Statistics Office (NSO) (now the Philippine Statistics Authority (PSA)), dated 29 January 1996, was presented, stating that there are no birth records under your name on file.

The letter recommended checking again with the PSA for an updated record.

The respondents first argue that the court lacks subject matter jurisdiction to hear this petition, under both 8 U.S.C. § 1252(b)(9) and § 1252(g). The court has thoroughly considered its jurisdiction to review post-removal-order immigration detention. For reasons given before, jurisdiction is secure insofar as this opinion goes. *See Liang v. English*, No. 3:25cv1052, 2026 WL 835853, 1 (N.D. Ind. Mar. 26, 2026) (Leichty, J.).

Turning to the merits, 8 U.S.C. § 1231(a)(6) gives the government the authority to detain a noncitizen while it effectuates a removal order. All noncitizens must be detained for a 90-day "removal period." 8 U.S.C. §§ 1231(a)(1), (a)(2). This removal period begins on the latest of three events: (1) the date the removal order becomes administratively final, (2) the date of a reviewing court's final order if the noncitizen seeks judicial review and the court orders a stay of removal, or (3) upon the noncitizen's release from non-immigration confinement. 8 U.S.C. § 1231(a)(1)(B). It is unclear how this removal period applied to Mr. Pagsisihan, whose deportation order was issued under a different set of immigration

4

laws. But even assuming the removal period started on September 29, 2025, with his current period of detention, it has passed.

Beyond this 90-day period, certain classes of noncitizens may be detained even longer—what the statute calls inadmissible aliens (under 8 U.S.C. § 1182), those who have violated their nonimmigrant status conditions (under 8 U.S.C. § 1227(a)(1)(C)), those who have committed certain crimes, such as aggravated felonies, drug trafficking, or illegal firearm offenses (under 8 U.S.C. § 1227(a)(2)), those removable for national security or foreign relations reasons (under 8 U.S.C. § 1227(a)(4)), and those whom the Attorney General determines to be a risk to the community or unlikely to comply with the order of removal. These noncitizens "may be detained beyond the removal period" or released on conditions of supervision. 8 U.S.C. § 1231(a)(6).[2] The respondents rely on § 1231(a)(6) as the basis for Mr. Pagsisihan's current detention; and, given his criminal convictions, his detention falls under that statute.

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," and "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). To avoid a constitutional due process problem with § 1231(a)(6), and specific to a noncitizen who is present within this country and who is ordered removed, the law requires that his detention

---

[2] For noncitizens who don't fall in these categories, if they are not removed during the 90-day removal period, they must be released, subject to conditions of supervision. 8 U.S.C. § 1231(a)(3).

5

be limited to a reasonable time—namely "a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689; *see also id.* at 682, 690-91.

Any § 1231(a)(6) detention of a present-but-ordered-removed noncitizen has this limitation, as it guards against the possibility that he might be indefinitely detained should his removal not be reasonably achievable. His indefinite detention would raise a serious constitutional problem. *Id.* at 690; *see also Clark v. Suarez Martinez*, 543 U.S. 371, 378 (2005) (same). In short, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

The historic writ of habeas corpus grants a federal court the authority to review a noncitizen's detention and to decide independently whether "a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal." *Id.; see also* 28 U.S.C. § 2241(c)(3). "In answering that basic question, the habeas court must ask whether detention exceeds a period reasonably necessary to secure removal" and "should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. When removal proves reasonably foreseeable, the court can consider other factors (such as risk of crime) and often will deny habeas relief; whereas, when removal seems attenuated or unlikely, the court will order the individual's release, albeit conditioned on appropriate terms of supervision and the noncitizen's compliance with these terms. *See id.* at 699-700. After all, the choice isn't between detention and a noncitizen "living at large," but between detention and a noncitizen's supervised release on conditions that he cannot violate. *Id.* at 696.

The law materially defers these difficult judgments to the Executive Branch for a six-month period during which detention is considered presumptively reasonable to execute a removal order. *Id.* at 700-01. Even thereafter, the court listens with care when the government's "foreign policy judgments"—such as the status of repatriation negotiations—are implicated and otherwise affords "appropriate leeway when its judgments rest upon foreign policy expertise." *Id.* at 700. A noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. But "once [he] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing." *Id.* (cleaned up); *see also Suarez Martinez*, 543 U.S. at 385-86.

The petitioner bears the initial burden, and the court sees no reason today to alter this. *See* 28 U.S.C. § 2241; *Zadvydas*, 533 U.S. at 700; *see also Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009). Nor must the court engage the same constitutional dilemma that § 1231(a)(6) could present merely because this is a subsequent period of detention and not his first. *See Zadvydas*, 533 U.S. at 690. The court may consider not just what led to his original detention and release years ago, to the extent still pertinent, but also what circumstances newly exist today. Despite the old adage, past isn't always prologue in this context, and just because removal couldn't occur before doesn't mean it can't reasonably occur today under renewed efforts. At the same time, nothing in § 1231(a)(6) and nothing in *Zadvydas* suggests that the mere passage of time erases everything about the initial showing to make it all irrelevant. *See also Vu v. English*,

7

No. 3:25cv999, 2026 WL 194171, 4-5 (N.D. Ind. Jan. 26, 2026) (Leichty, J.); *cf. Kem v. Noem*, No. 3:25cv997, 2026 WL 100566, 3-4 (N.D. Ind. Jan. 14, 2026) (Leichty, J.).[3] After all, as the period of confinement grows, what qualifies as a reasonably foreseeable future conversely must shrink. *Id.* at 701.

Mr. Pagsisihan was detained at least once before for several months in 1995 until he was released on a supervision order. Back then, ICE's precursor agency could not obtain a travel document for him to return to the Philippines because he did not have a birth certificate to prove his citizenship. That period of detention is not at issue here.

It appears that Mr. Pagsisihan's later criminal activity spurred the government to restart efforts to remove him, and the regulations contemplate that, upon a violation of a condition of release, a noncitizen "may be continued in detention for an additional six months in order to effect the alien's removal, if possible, and to effect the conditions under which the alien had been released." 8 C.F.R. § 241.13(i)(1). The respondents, though, do not cite to a violation of the conditions of release as a basis for his detention, arguing instead that he is being detained pending the execution of his removal to the Philippines. Whatever serious concerns, and thus reservations, the court may have given Mr. Pagsisihan's criminal history, it would be inappropriate for the court, as a neutral arbiter, to construct arguments for the parties. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (party presentation rule); *see also Margolin v. Nat'l Ass'n of Immigr. Judges*, 2026 WL 1463466, 2 (U.S. May 26, 2026) ("Federal

---

[3] No one should read either *Vu* or *Kem* as indicating that an original showing always remains gospel or shifting the burden.

courts adhere to the principle of party presentation," meaning "points not argued will not be considered.").

In looking at the likelihood of removal, the government says only that travel documents have been requested but says nothing about when those documents were requested (despite being told in the order to show cause to provide such date) or how long it generally takes to receive a response from the Philippine government. Nor does the government explain whether it is even possible to obtain a travel document for Mr. Pagsisihan without a birth certificate. The government may have ways of obtaining a travel document that are unavailable to Mr. Pagsisihan as an individual, but the government never makes such a proffer. In short, Mr. Pagsisihan has provided evidence that the Philippines will not issue him a travel document without a birth certificate, which is supported by the unsuccessful attempt to deport him in 1995. The respondents have not provided any information to suggest that a travel document is possible today without a birth certificate. The government also offers no prospect of removal to a third country. The court cannot find on this record that there is a reasonable likelihood of removal in the foreseeable future. Mr. Pagsisihan has been in custody beyond any presumptively reasonable period.

More months have passed since the deportation officer signed the declaration stating that travel documents have been requested, and no additional progress has been reported since then. Mr. Pagsisihan's current period of detention is now entering its ninth month. The only reasonable finding on this record is that immigration enforcement could not remove Mr. Pagsisihan to the Philippines in 1995, and that removal efforts reinitiated in September 2025 are bearing no fruit, or even seeds that might foreseeably grow into fruit.

Mr. Pagsisihan has met his burden. The respondents have not rebutted his showing. Accordingly, consistent with *Zadvydas*, 533 U.S. at 699-700, and because removal is not reasonably foreseeable, the court finds "continued detention unreasonable and no longer authorized by statute," albeit with his release occurring under supervision.

For these reasons, the court:

(1) GRANTS the petition (ECF 1) to the extent that the court ORDERS the respondent to release Andrei Pagsisihan on conditions of supervision they deem appropriate and to certify compliance with this order by filing a notice with the court by **June 10, 2026**;

(2) DIRECTS the clerk to email a copy of this order to the Warden of the Miami Correctional Facility at the Indiana Department of Correction to secure Andrei Pagsisihan's release;

(3) DENIES AS MOOT any other pending motion; and

(4) ORDERS any fee petition to be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

SO ORDERED.

June 8, 2026

*s/ Damon R. Leichty*
Judge, United States District Court

10